Good morning, Your Honors. May it please the Court, my name is Kurt Anderson. I represent Lariat Companies, Inc. in this appeal from a decision of the Bankruptcy Appellate Panel. It's an appeal from the BAPS order zeroing out Lariat's claim in the Ms. Wigley's Chapter 11 case and from an earlier order of the Bankruptcy Court limiting but partially allowing that claim. The dispute between Lariat and the Wigleys has a complex history going back over the current decade. It began simply enough with an order for summary judgment in a state court, but since then it has had a long and very complex history through fraudulent transfer and bankruptcy court litigation. In its decision below, the BAPS decided that Lariat had no claim to be paid in Barbara Wigley's separate Chapter 11 case. But the Minnesota State Courts thus far have determined that Barbara has a liability to Lariat that survived Michael Wigley's bankruptcy case. And then... What's the status of the state court litigation? It's on appeal to the Minnesota Court of Appeals. The appeal has been stayed pending this decision. Why? Well, of course, we would have taken the position that they ought to go ahead and decide it so we know whether we have a state court claim or not, but they decided in the exercise of their discretion, I would have to say, simply to stay it. There was no memorandum accompanied it that I can recall. Is there a motion to stay it? Yes. My colleague, Mr. Brueggemann, brought that motion on behalf of Mrs. Wigley. Did Lariat respond to the motion? Now, once again, I'm relying on memory, but I'm fairly certain we did. We told the Court of Appeals, look, this has been delayed a long time already. It was stayed during... I couldn't find it in the record of our case. Oh. Is this not in the federal record, these papers that were filed in the Minnesota Court of Appeals? Maybe they wouldn't be in the federal record. It was neither in our appendix nor in... No, it hasn't been attached to any bank. I just wondered why. Apparently, the parties are fighting about a question of Minnesota law, and the Minnesota Court of Appeals has the issue and has stayed waiting for a federal court to decide the Minnesota question. I fully sympathize with that confusion or conundrum or whatever you want to call it. I don't remember if you supported the stay. No, I didn't support the stay. I told the Court of Appeals, look, we've already been delayed months and years on this. Unfortunately, my objection was overruled. Mr. Brueggemann's motion was granted. Perhaps he can address that. Do you think our court should stay this case pending a decision by the Minnesota Court of Appeals? No, I think that this court should consider the Minnesota State Court decision as binding applying rules of collateral estoppel and then remand or decide the question of the claim limitation. Now, granted, the Minnesota Court of Appeals may undo all your work if they reverse their trial court, but we have a problem of two trains kind of heading down the same track or parallel tracks and which one's going to get to the station first. The key factor is that the Minnesota train left the station first. They own this issue just based on who had it first and who ruled on it first. I was going to say that my prepared remarks really address the merits, but I agree that the procedural history of this case is extremely tangled. I'm available to answer other procedural questions as the court may have them. I was going to address the merits because I think that's probably the best way to cut to the chase in this case. First of all, Larry, it has a claim to be allowed to be paid in Minnesota's, in Barbara's Chapter 11 case, and second, of course, that in our view the 502B6 claim limitation does not apply. So first, the facts of the case are that Michael Wigley, in 2011, incurred liability to Lariat, later summarily adjudicated, hotly contested, but that's now final. Months and months later, March and May of, excuse me, that was 2010, March and May of 2011, Mrs. Wigley receives fraudulent transfers. We know the facts. What? I think we know the facts. Okay, okay. Then let me proceed on to the... If you wanted to address the merits. Sure, sure. Thank you. I'm going to skip ahead a couple pages here. Well, you can do it however you want. Yes, no. I'm just saying you have limited time and there's some complicated legal issues here. Yes, yes. I agree. I'll be open to it on that. I appreciate that and I'm going to go there right now. As Justice Brennan once alleged to have said, you're there. So I'm going there. In short, the Minnesota Fraudulent Transfer Statute, which is a version of the Uniform Fraudulent Transfer Statute as it existed in 2011, basically had a measure of damages in it. The measure of damages, to paraphrase, is the lesser of two numbers. Court asks itself, assuming once it finds fraud, it asks itself, A, how much was transferred? What's the value transferred? And B, what would satisfy the plaintiff's claim? The lesser of those two numbers is the number that the defendant is liable for. So if you take the lariat, think of the lariat original judgment against Michael Wigley as a tree, and it's a growing tree because post-judgment interest is accruing. We go through the Michael Wigley chapter. Well, first of all, the state court says, okay, Barbara, you're jointly and severally liable for a part of this. That part is the bottom of the tree. Go through Michael Wigley's Chapter 11 case. Michael Wigley pays, in round numbers, $637,000. That much gets paid. We haven't even touched Barbara Wigley's liability yet. In between, there's about $2 million a lariat's never going to collect. It's going to have to walk away from. The court properly applied the landlord limitation in his case because he was a guarantor. And so nothing that happened in Michael's case reduced the claim against Barbara. And the best I can give you to supplement my written argument is the tree analogy. Michael, tree this big, Barbara holds the bottom part of the trunk. Michael pays some of the top branches off. There's still a lot to be paid, and Barbara does not benefit from that payment. So the BAPA is just plain wrong that it was no predicate claim. And moreover, to go back into procedural issues, the state court heard arguments, heard letter arguments. Everybody knew that payment and discharge were happening. They say Judge McGill only addressed discharge and not payment.  Well, yes, and I think the defendants acknowledge that in their arguments to the state court. Referring to my appendix, lariat's appendix, pages 178 and 179, in which Barbara's pleading says, look, Your Honor, payment and discharge are coming up. Payment and discharge twice, bottom of page 178 of my appendix, bottom of page 179. From that point forward, I think the discussion of discharge was just shorthand for the concept of payment and discharge because the two are basically twins, symbiotic as I put it, in a Chapter 11 individual bankruptcy case. You have to make the plan payments to get the discharge. So you see at the bottom of page 178, bottom of page 179, they're saying payment and discharge. They're acknowledging that connection. I don't want to belabor this. Minnesota law, would collateral estoppel apply based on the state district court opinion, even though there's a pending appeal? Yes, that is the Brown-Wilbert case that I cited to you. Okay. And I think Mrs. Wiggler has acknowledged some Eighth Circuit case law on that as well, but obviously it's a state law that governs the question. That's why I wanted to make sure you had a Minnesota case. Right. Now, basically, in a nutshell, you're aware of the facts. That really covers the issue as far as I'm concerned. What about the cap? Oh, yeah, that's what I wanted to go to next. Okay. Thank you. Well, you see the words in the statute, resulting from. What do they mean? Now, we're seeing a lot of other phrases being proposed as the meaning. We're seeing derivatively. We're seeing ultimately resulting from. I have to go to your sister circuits, particularly the Pacific case. I cited you three of them. Two of them expressly interpret the phrase resulting from, and they say it's proximate cause. We have a pretty good idea what proximate cause is. That's the immediate preceding cause. In this case, when you have a lease termination liability for the principal and guarantor, that occurs in 2010. Months later, a fraudulent transfer. Mrs. Wigley owed nothing at the time of the lease termination. There was nothing about that lease termination that made Mrs. Wigley liable for anything. She became liable months later when she received fraudulent transfers. I can insist on it and jump up and down, but in the end, this court is going to have to decide what resulting from means. But isn't Lariat's claim against her, it derives from the lease originally? Absolutely. If it derives from the standard, we lose the case. Pardon me? If derives from is the standard. Okay. So you think it derives from the lease, but it's not caused by the lease? It's not resulting from the lease. Correct. The lease limitation does not apply. This is a matter of first impression. So what the court does here is going to provide guidance not only to courts in this circuit, but probably to courts nationwide. And once again, my argument is now boiled down to a nutshell. Going back to the tree. Sure. If I understand the BAP's position on this. Sure. They're essentially saying the bankruptcy proceeding involving Michael shrunk the tree. Yes. Such that all that's left of the tree is the part that he paid. Yes. You want us to say, no, the whole tree is still there, I guess. Yes, and there's lots of authority. I'm sorry. There's lots of authority. Collaborate on that. I know there's some cases on it, but what's the rationale? The rationale is that if Mrs. Wigley wants the benefit of something happening in Mr. Wigley's case, as a threshold matter, she should have been a co-debtor in that case. There is a lot of case law that says you can't watch somebody else go through bankruptcy. A guarantor, for example, that wants the benefit of a landlord claim limitation is not going to get it unless that person himself is a debtor. But the BAP's argument was the only reason she's on the hook as a transferee is that there was a claim against Michael. Right. And so if that claim is resolved, then there's no claim remaining against her. Well, I think they're conflating the term claim as it's understood in the bankruptcy sense. In other words, what's going to get paid off from a bankruptcy estate? And the liability of Michael disregarding the discharge, because for fraudulent transfer purposes, you disregard the discharge. You just see how much of it has been paid. And, you know, if you're not reaching the bottom of that tree where there's a joint and several liability, you're not benefiting Barbara by that. If Michael happened to have paid, let's say, $2,600,000 instead of just $600,000, he probably would have cut into Barbara's claim and reduced her liability. But those aren't the facts of this case. I see that I'm getting short on time. Do you wish to save time for a moment? I would. You may. Thank you. Thank you for your argument. Mr. Brueggemann, we'll hear from you. Thank you, Your Honor. Thank you. Good morning, Your Honor. May it please the Court. My name is Michael Brueggemann. I'm accompanied, and I represent Appley, Barbara Wigley, in this matter. I'm accompanied this morning by Mr. John Leamy, who is Ms. Wigley's primary bankruptcy counsel in this matter. And he's actually done most of the labor on this claims objection process, including appearing at the BAP hearing and also arguing in the underlying bankruptcy matter. I began representing Appley halfway through Michael Wigley's Chapter 11 bankruptcy case, so I get involved in her current bankruptcy when events start to reach back into that past, including the collateral estoppel arguments. Your Honor, before I begin, I wanted to actually address one of the questions you had about the stay of the state court appellate process. So that proceeding, the Court of Appeals, that was actually stayed originally upon Appley filing bankruptcy in December 2016. And that stay remained in place throughout this entire claims objection process up until May of 2018, so just before the BAP hearing. We proceeded with this claims objection with the arguments that were raised in this claims objection and that so-called state court train was stayed during that entire time. So our position— Because of the automatic stay. Because of the automatic stay. So what happened in May of 2018? Up until 2018, but there was no motion, for instance, to lift that stay by appellant so that it could resume the state court train. So what happened in May of 2018? You say it was stayed through then. The bankruptcy court asked us at that point, after it had ruled on this claims objection and after this claims objection had now gone up to the BAP, that there were separate issues in that Minnesota State Court of Appeals case, including the discharge issues and actually still issues with the merits of the underlying fraudulent transfer judgments, asked us to stipulate and go back and have that appeal proceed. And it did. Then it became a dual-track process again where the BAP was considering the arguments on the claims objection, the state court was considering separate arguments raised in that proceeding, and it's been briefed and it's been restayed again because of the BAP's ruling that appellant's claim against appellee here has been extinguished by Mr. Wigley's payment of that claim. What do you mean it was stayed because of that? So there were multiple proceedings. The first thing we did was we asked the bankruptcy court actually said because of this BAP decision, we're going to stay some bankruptcy matters that were pending because it appeared— Why was the state appeal stayed? What happened? It appeared to us that the fact that the claim was extinguished, as the BAP had ruled, was complete disposition of the entire case and claim. There's nothing left to argue about. So you moved to dismiss the appeal? No, we just moved to stay it pending further appeal with the Eighth Circuit. Why shouldn't we let the state court decide this question of state law? This is not solely a question of state law, Your Honor, and it is not before the Minnesota Court of Appeals. The BAP's ruling relies on both federal and state law, namely the cap, the 502b6 cap. The cap issue is a federal question. I'm talking about the extinguishment issue. The extinguishment issue, though, relies on that cap. Without the cap, the extinguishment issue doesn't really work. You need the—just through the BAP's process, it starts with Appley is only liable as transferee, which under the, I think, undisputed case law, that makes her derivatively liable along with the debtor. There was this concept of the tree during Appellant's oral argument. The derivative liability puts Mr. Wigley and Appellee on the same branch. That's essentially what derivative liability is. There's no lower trunk, upper trunk. They're just on the same branch of liability for the lease claim. She has no other independent— Counsel, let me interrupt you. I thought you've gone to the cap issue, which is, in my mind, the second issue. I thought the first issue was whether they even have a claim at all against— And that's what I'm—yes, Your Honor, that's what I'm arguing, because they don't have a— Counsel, please address the plain language of the bankruptcy code written by Congress, been around forever. Discharge of a debt of the debtor does not affect the liability of any other entity or person on or the property of anybody else for the debt, and it only goes to the personal liability of the debtor. It looked to me like the BAP missed that point. No, because the BAP decided the claim wasn't extinguished because of the discharge. It was extinguished because of the capping, you know, the Congress capping of the landlord claim so that landlords aren't recovering excessive rents from a bankruptcy debtor. The capping of the claim, then applying MUFTA's derivative liability, so the claim is capped, the capped claim is paid, and then there's Michael Wigley owes nothing further. Then we'll go to the state court issue, and if you look at that, it says the lesser of the asset or the amount necessary to satisfy the creditor's claim, so they still have a claim against Ms. Wigley based on the second clause, the amount necessary to satisfy the creditor's claim. The claim against the transferor, Your Honor, so the claim against Mr. Wigley. If you go back to the definitions of the claim, what a claim is, it's a claim against the transferor. MUFTA's shorthand for Fraudulent Transfer Act is a separate collection remedy against the debtor here, Mr. Wigley, who is liable for a lease guarantee. It doesn't create an independent claim against Mrs. Wigley, and that's been, I think, repeatedly decided by the 8th Circuit, and I think the most recent case was the court. But there's a judgment against her for the full amount of the lease, or not for the full amount, for the amount that was transferred, the $700 and some. Yes, but that judgment, the fact that there's a judgment doesn't change the character of the claim, and the claim remains derivative of the lease claim against Michael Wigley. Even the Bankruptcy Court decided that in this case when it applied the rent claim separately to Appellant's claim here. So, Your Honor, the Bankruptcy Court... At the time that judgment was entered, the claim against Michael exceeded the $700 number. And the State Court, when we filed a motion to vacate on equitable grounds, including his successful bankruptcy case, the State Court said, I can't retroactively vacate a judgment. But what we argued, and what Mr. Lamey argued in the claims objection process, is that we're not arguing back to the merits of the fraudulent transfer statute, or the fraudulent transfer claim, and the equities of it. He's now paid his liability. So there's nothing further to collect from a derivative transferee. So the State Court never made any determinations regarding 502b-6, and the landlord cap, and it never made any determinations about the effect, the actual effect of Mr. Wigley's payment. There wasn't, for instance, a judgment reduction process initiated under Minnesota Statute 548-15 that I referenced in the brief, which would be the ability to say, well, now a payment has occurred on a judgment, and our judgment should equally be satisfied because of the derivative nature of fraudulent transfer. Well, under your view of this, then, what's to prevent a debtor from fraudulently transferring all of his assets, declaring bankruptcy, getting a discharge from the claim for a substantial discount, and then the transferee gets to keep the money and they make out with a windfall? Well, a couple of points. I'm not sure that's the facts of this case because Congress... No, but that's the legal implication of the legal rule you're suggesting, isn't it? That's my question, I guess. No, not entirely, because I think the BAP's rule is much more narrow than that. The BAP is not relying on a discharge in any manner. So the BAP's not saying, you know, any Chapter 7 debtor can come in now, transfer his assets, get a discharge, and leave the transferee scot-free. Why not, as long as he pays whatever it takes to get the discharge? But that's a narrow rule. I mean, this is a pretty rare case where you have a landlord. The BAP relied on the landlord cap as capping Michael Wigley's liability. So this situation only applies where you have that cap in place in the first instance. And then not only it has to be paid on top of it. So the discharge... But doesn't that argument of the BAP run directly into the language that I quoted you from 11 U.S.C. 524? No, Your Honor, because that's an issue of claim disallowance, and the 524E is a matter of discharge. This is liability. I know you're trying to draw a fine line, but Congress said it doesn't affect the liability of anybody else for the debt, period. But Michael Wigley's liability, Your Honor, is affected by the disallowance provision under 502. So we don't even get to 524 because... Counsel, 524 is a statement of Congress's law. I have trouble getting around those bare words. As is 502B6, though, Your Honor. And it's a substantive limitation imposed by Congress. Michael Wigley paid it. No one disagrees that Michael Wigley owes nothing further to appellant. Now, appellant raises this argument that, well, there's this $2.2 million of floating money out there that's owed. Well, I mean, there's still a landlord. So it might be true there's still a debt, but there's not a debt that Michael Wigley owes. His payment of the debt has been extinguished. I thought this case was Ms. Wigley's case. Yes, but she's just... The BAP determined that she's... The three bankruptcy judge panel at BAP unanimously determined that she's only derivatively liable, and that's under Eighth Circuit law. And being derivatively liable means that if the debtor is no longer liable for the claim, neither is she. And so the claim is zero, disallowed in its entirety, and there's nothing further to collect. And 524E isn't relevant to the discussion at all because it's not relying on discharge. And I'm not aware of case law that supports Lariat's position that 502B6 does not operate in that fashion. Lariat cites cases to the effect that, well, 502B6 can apply to co-debtors that don't file bankruptcy, but Barbara Wigley is not a co-debtor. She's not a guarantor. She's not independently liable under state law. The cases that Lariat cites on contract, you know, guarantor liability, I think there was one from Maryland. It went and looked at Maryland state law and said, yep, a guarantor is not derivatively liable. It's independently liable. Well, in Minnesota, a transferee is not independently liable. She is derivatively liable. So why don't you address what Judge Benton called the second issue, which is whether this cap applies on the ground that her liability resulted from the lease? Yes, Your Honor. I did not plan to address it in great detail because it is mooted by the bankruptcy courts. Well, as soon as you win on the first issue. Correct. Correct. Again, it relies on the similar train of argument, which is under Minnesota state law, a transferee liability is derivative. It's not an independent liability. And it takes the same character under bankruptcy. When 502B6 is looking at the nature of the claim, it adopts the same character as the transferor or debtor's liability, which undisputedly in this case was a lease termination claim against Mr. Wigley. Lariat stated that this is an issue of first impression, but there has been case law similar. I think there's a case Blatstein. That's a one-judge bankruptcy Pennsylvania case? Sure. Yes, Your Honor. But it was against a garnishee who was liable for, you know, failing to respond to a garnishment summons, a collection remedy similar to, well, not similar, but on par with a derivative collection remedy like fraudulent transfer law. And the judge applied the cap to the garnishee's liability in its case. So, you know, we brief that issue. I don't have a lot to add to that issue beyond the briefing, but it turns again on this issue that a transferee is derivatively liable, which is not contested, I don't think. I don't think anyone has contested that basic principle. The BAP, in my opinion, Your Honor, and Your Honor's three-judge bankruptcy judge on the BAP, simply followed a step-by-step analysis here through the statutes, federal and state statutes, reaching a result that is not overcome by reference to 524E, which are involved discharge cases where, by the way, there hasn't been caps applied in any of those cases that I'm aware of, those 524E cases that are cited, or the co-debtor guarantee cases. Your Honor, on collateral estoppel, what difference does it make whether the discharge and the payment are based on a cap or some other reason? Well, Your Honor, Congress imposed the cap. It's a substantive claim limitation. When bankruptcies are filed, federal law overrules state law rights. I don't think that's the issue. That's not true. The property rights, the United States Supreme Court said for 60 years, are dependent on state law. Butner is the 1940-something case of the Supreme Court saying that. But if you have federal bankruptcy law that actually addresses a specific state law right that federal law controls, that's why we have lien stripping and bankruptcies and a whole lot of other remedies that... But state law creates the right, you agree. State law creates property rights in bankruptcy. And, again, I'm not sure this is a property right versus a claim. I mean, there's certainly a state law claim created, okay? I agree with that. But it's derivative under state law. So BAP took that position that it's a derivative claim, showed how the transferor paid it, and it flows through that her liability is zeroed out as well. I see my time is up, Your Honor. I think this Court should affirm the simple reasoning of the BAP on this matter. Thank you. All right, thank you for your argument. Mr. Anderson, we'll hear from you in rebuttal. Yes, thank you again. First of all, I neglected to acknowledge my colleague, George Warner, who's been my co-counsel throughout this and been of excellent assistance to me in this case. Secondly, I really don't have any rebuttal, but we have, despite our vigorous contest on the issues here, Mr. Brueggemann, Mr. Lamy, and the two of us have been able to work out procedural issues fairly well. We've been complimented on that several times. The reason I say that is because if the Court needs to see what the Minnesota Court of Appeals stay motion was all about, I'm sure we could stipulate and supplement the record with the motion, the opposition, and the order if the Court so directs. It's just an idea. We'll leave it to the Court whether it wants to direct us to do that or not. I don't think Mr. Brueggemann would have a problem with that. Well, we'll let him speak for himself. Okay, thank you. All right. Very well, the case is submitted. Thank you, both counsel, for your arguments.